**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

DR. ADRIAN DOUGLAS and     )
DR. BRUCE DOUGLAS,     )
     )
     Plaintiffs,     )
     )
vs.     )     Case No.
     )
THE BOARD OF TRUSTEES OF CLOUD     )
COUNTY COMMUNITY COLLEGE,     )
Serve:  President Amber Knoettgen     )
     2221 Campus Drive     )
     Concordia, Kansas, 66901     )
     )
and     )
     )
GREGORY P. ASKREN, in his     )
     individual capacity,     )
Serve:  1566 N. 250th Road     )
     Concordia, KS, 66901     )
     )
     Defendants.     )

## COMPLAINT

Plaintiffs Dr. Adrian Douglas and Dr. Bruce Douglas (collectively, "Plaintiffs"), for their complaint against The Board of Trustees (the "Board") of Cloud County Community College (the "College") and Gregory P. Askren ("Askren"), state as follows:

### INTRODUCTION

1.     On May 8, 2020, at the urging of long-time Board member Askren, the College fired the only two black employees at its Concordia, Kansas campus: President, Dr. Adrian Douglas, and Coordinator of Student Engagement, Dr. Bruce Douglas, husband and wife.

2.     Even though it had just days earlier evaluated Dr. Adrian Douglas as meeting or exceeding the vast majority of its expectations, the Board—at Askren's insistence—conducted a

series of secretive, closed-door meetings, violated College protocol, and fired <u>both of the Plaintiffs</u> on the same evening, one within minutes of the other.

3.      The College then rushed to change the locks on Dr. Adrian Douglas' office doors, perceiving her as a literal threat to harm the College in some way.

4.      Students and faculty alike demanded an explanation for the sudden and shocking terminations, and expressed concerns that the Board may have let personal biases influence its decision.

5.      The Board, however, steadfastly refused to even attempt to justify its conduct.

6.      Several months later, Askren—who continues to sit on the College's Board—posted a lengthy, racist screed on social media that quite clearly explains his own motivations *vis a vis* the Plaintiffs.

7.      Askren's post, which remains publicly available on his Facebook page as of the time of filing,[1] reads in part as follows:

> The hypothesis to be tested: Can a people taken from the jungles of Africa and forced into slavery be fully integrated as citizens in a majority white population?
>
> The whites were descendants of Europeans who had created a majestic civilization. The former slaves had been tribal peoples with no written language and virtually no intellectual achievements. Acting on a policy that was not fair to either group, the government released newly freed black people into a white society that saw them as inferiors. America has struggled with racial discord ever since.
>
> . . .
>
> Some thought that what W.E.B DuBois called the Talented Tenth would lead the way for black people. A group of elite, educated blacks would knock down doors of opportunity and show the world what blacks were capable of. There is a Talented Tenth. They are the black Americans who have become entrepreneurs, lawyers, doctors and scientists. But ten percent is not enough. For the experiment to work, the ten percent has to be followed by a critical mass of people who can hold middle-class jobs and promote social stability. This is what is missing.

---

[1] Gregory P. Askren, FACEBOOK (Apr. 23, 2021),
https://www.facebook.com/Greg.Cowboy.Askren/posts/10157717457841373

Through the years, too many black people continue to show an inability to function and prosper in a culture unsuited to them. Detroit is bankrupt, the south side of Chicago is a war zone, and the vast majority of black cities all over America are beset by degeneracy and violence. And blacks never take responsibility for their failures. Instead, they lash out in anger and resentment.

Across the generations and across the country, as we have seen in Detroit, Watts, Newark, Los Angeles, Cincinnati, Ferguson, Minneapolis, Baltimore, and countless others, rioting and looting are just one racial incident away. The white elite would tell us that this doesn't mean the experiment has failed. We just have to try harder. We need more money, more time, more understanding, more programs, and more opportunities and now REPARATIONS for slavery that had nothing to do with blacks today.

But nothing changes no matter how much money is spent, no matter how many laws are passed, no matter how many black geniuses are portrayed on TV, and no matter who is president[.] Some argue its (sic) a problem of culture, as if culture creates peoples (sic) behavior instead of the other way around. Others blame white privilege.

But since 1965, when the elites opened Americas (sic) doors to the Third World, immigrants from Asia and India people who are not white, not rich, and not connected have quietly succeeded. While the children of these people are winning spelling bees and getting top scores on the SAT, black youths are committing half the country's violent crime, which includes viciously punching random white people on the street for the thrill of it that has nothing to do with poverty.

The experiment has failed. Not because of white culture, or white privilege, or white racism. The fundamental problem is that American black culture has evolved into an un-fixable and crime ridden mess. *They do not want to change their culture or society, and expect others to tolerate their violence and amoral behavior[.] They have become socially incompatible with other races by their own design, not because of the racism of others – but by their own hatred of non-blacks.*

A copy of Askren's Facebook post is attached hereto as **Exhibit A**.

       8.     Adapted from a blog post by a group that the Southern Poverty Law Center considers a "Designated Hate Group,"[2] Askren's vile post depicts a comprehensive and overtly

---

[2] Anthony Bryan, *Ten Percent is Not Enough*, AMERICAN RENAISSANCE (Sept. 23, 2014) (archived at ARCHIVE TODAY (Sept. 24, 2014), https://archive.is/ypopW) (original post); *American Renaissance*, S. POVERTY L. CTR., https://www.splcenter.org/fighting-hate/extremist-files/group/american-renaissance (last visited Sept. 13, 2021) (designating the New Century Foundation and its flagship publication, American Renaissance, as a white nationalist hate group).

racist worldview that removes any shred of doubt about why he sabotaged the Plaintiffs' leadership at the College, a school with a minority population of approximately 30%.[3]

9.      Askren believed then, as he believes now, that the Plaintiffs are inferior human beings—part of a failed experiment, unfixable, crime-ridden, and "socially incompatible" with other races—which explains why he repeatedly reminded Dr. Adrian Douglas that, as the President of the College, she needed to be subservient to him and the Board, not unlike the "former slaves" referenced by Askren in his Facebook post.

10.      Plaintiffs bring this action to hold the Board and Askren, individually, accountable for discriminating against them on the basis of their race in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964.

## PARTIES, JURISDICTION AND VENUE

11.      Plaintiffs are individuals residing in Prattville, Alabama, and they are both former employees of the Defendant.

12.      Dr. Adrian Douglas is African American, and she was previously employed as the President of Cloud County Community College.

13.      Dr. Bruce Douglas is African American, and he was previously employed as the Coordinator of Student Engagement at Cloud County Community College.

14.      Defendant Board of Trustees of Cloud County Community College is the governing body of Cloud County Community College.

---

[3] *Cloud County Community College: Overview*, U.S. NEWS & WORLD REPORT, https://www.usnews.com/education/community-colleges/cloud-county-community-college-CC01572 (last visited Sept. 13, 2021).

15.     The Board, which has elections in November of every odd year, is made up of six (6) members, and newly elected Board members begin their terms in January of the year following their election.

      a.  In 2017, the Board's members were Linda Richard (Chair), Askren, David Clemons, Larry Henry, Tom Tuggle, and Ellen Anderson.

      b.  After an election in November 2017, the 2018 Board members were Askren (Chair), Larry Henry, Tom Tuggle, Ellen Anderson, Jesse Pounds, and Pat MacFarlane.

      c.  In 2019, the Board's members were Askren, Larry Henry (Chair), Tom Tuggle, Ellen Anderson, Jesse Pounds, and Pat MacFarlane.

      d.  After an election in November 2019, the 2020 Board members were Askren, Ellen Anderson, Jesse Pounds (Chair), Pat MacFarlane, Jim Koch, and Richard Hubert.

      e.  All of the above-referenced Board members are Caucasian.

16.     The Board can be served through the College's President, Amber Knoettgen, at 2221 Campus Drive, Concordia, Kansas, 66901.

17.     The College is a public community college with campuses in Concordia, Kansas, and Junction City, Kansas.

18.     Defendant Gregory P. Askren is an individual residing in Concordia, Kansas. He can be served at 1566 N. 250th Road, Concordia, KS  01.

19.     Plaintiffs' claims are brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") (42 U.S.C. § 2000e, *et seq.*) and 42 U.S.C. § 1981.

20.     The Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331.

21.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in the District of Kansas.

## FACTUAL BACKGROUND

22.     ***Plaintiff Dr. Adrian Douglas***. After applying to be the College's President, Plaintiff Dr. Adrian Douglas interviewed with the 2017 slate of Board members listed above.

23.     On information and belief, Dr. Douglas was the consensus pick of campus representatives involved in the College's search for a President, and also the first choice of the search committee itself.

24.     The Board, which at the time was chaired by Linda Richard, decided to offer the position instead to Dr. Mark Smith, a white man, who initially accepted the position and then abruptly resigned a month later.

25.     Without engaging in another search process, the College then offered Dr. Douglas the position of President.

26.     ***Dr. Adrian Douglas' Employment.*** On or about April 5, 2018, Dr. Douglas signed an Employment Contract with the College, a copy of which is attached hereto and incorporated herein by reference as **Exhibit B**, that characterized her as a "Regular Administrator," to work as the College's President.

27.     Under her contract, which had an initial term of May 9, 2018 through June 30, 2019, the College agreed to pay Dr. Douglas an annual salary of $145,000, and it agreed that any salary increase for future years would be determined by the parties at a later date.

28.     The College also agreed to provide Dr. Douglas with a monthly vehicle allowance, the use of an "at-will" cell phone, a housing and relocation stipend, and other fringe benefits.

29.     ***Gregory P. Askren.*** Askren has served multiple terms on the Board and chaired the Board at the time Dr. Douglas signed her contract.

30.     ***Termination of Kim Reynolds' Employment.*** In or around August 2018, Dr. Douglas recommended that the College terminate the employment of Kim Reynolds, who was employed as the College's Vice President of Student Affairs and Advancement.

31.     The Board approved Dr. Douglas' recommendation by a vote of 4-2, with Board members Askren and Larry Henry casting votes in favor of retaining Reynolds.

32.     On information and belief, Askren was disappointed with Dr. Douglas' leadership in this regard because he was a social friend of Ms. Reynolds and because he believed that Dr. Douglas should have been more subservient to him and the Board.

33.     ***The College's Coordinator of Student Engagement Position.*** In early 2019, the College posted a job opening for a Coordinator of Student Engagement position.

34.     Pedro Leite, who had recently been hired as College's Interim Vice President of Student Affairs, was the supervisor for the Coordinator of Student Engagement position, and led a search committee to fill the position.

35.     The search committee interviewed five or six candidates for the position, and Pedro Leite and Dr. Douglas also interviewed all of the candidates.

36.     One of the applicants for the position was Dr. Bruce Douglas, who is Dr. Douglas' husband.

37.     Despite his qualifications for the position, the search committee ranked Dr. Bruce Douglas fourth on their list of applicants.

38.     Dr. Douglas disagreed with the search committee's rankings and believed that the most qualified applicant happened to be Dr. Bruce Douglas, whose qualifications for the position were clear.

39.     Dr. Douglas sent the Board her recommendation to hire Dr. Bruce Douglas for the Coordinator of Student Engagement position, and she discussed her recommendation with the Board in an executive session.

40.     Prior to the Board's vote on the issue of whether to hire Dr. Bruce Douglas for the position, someone from the Board or the search committee breached the process' confidentiality requirements and leaked information to the public about the search committee's rankings of applicants for the position.

41.     On information and belief, the Board or search committee member who breached the confidentiality requirements wanted to tarnish Plaintiffs' reputations and make it seem as if Dr. Douglas' decision to hire Dr. Bruce Douglas was a product of nepotism rather than merit.

42.     Ultimately, the Board voted 4-2 in favor of hiring Dr. Bruce Douglas for the position, with Askren and Henry voting <u>against</u> Dr. Douglas' recommendation, thereby continuing their pattern of opposing any proposal put forward by Dr. Douglas since her recommendation to terminate Kim Reynolds.

43.     On information and belief, Askren and Henry believed that Dr. Douglas, as an African American woman, should be subservient to their wishes, even though making the decision to recommend Dr. Bruce Douglas for the Coordinator of Student Engagement position was well within Dr. Douglas' authority as the College's President.

44. ***Plaintiff Dr. Bruce Douglas.*** On or around January 29, 2019, against Askren's and Henry's wishes, the College hired Plaintiff Dr. Bruce Douglas as its Coordinator of Student Engagement on or around January 29, 2019.

45. Around that time, Dr. Bruce Douglas signed an Employment Contract with the College that paid him $14,000/year for his part-time position.

46. ***Restructuring of College's Administrative Positions.*** In her role as College President, Dr. Douglas recognized a need to restructure the College's administrative positions.

47. In the Spring of 2019, Dr. Douglas settled on a restructuring plan that combined two Vice President positions (the VP of Academic Affairs and the VP of Student Affairs positions) into one new position, the Vice President of Academic Affairs and Student Success.

48. Prior to the restructuring, Nancy Zenger-Benada was the VP of Academic Affairs, and Pedro Leite was the VP of Student Affairs.

49. On or around May 6, 2019, Dr. Douglas shared the restructuring proposal with the Board, and she asked the Board to not share the proposal with anyone, because she wanted to have conversations with the individuals whose positions were affected by the restructuring.

50. On or about May 7, 2019, during a cabinet meeting, Nancy Zenger-Benada's conduct suggested to Dr. Douglas that Nancy knew about the elimination of her position prior to the meeting, which in turn, caused Dr. Douglas to believe that someone from the Board had, again, leaked information in an effort to stir up trouble.

51. Dr. Douglas shared the restructuring proposal with Ms. Zenger-Benada and Mr. Leite in the afternoon of May 7, 2019, and encouraged them both to apply for the newly created role.

52. Pedro Leite was ultimately hired for the new position.

53.     Nancy Zenger-Benada did not submit her application.

54.     At a Board meeting on the morning of May 22, 2019, after Nancy Zenger-Benada's position was eliminated as part of the restructure, the Board went into executive session to meet with Ms. Zenger-Benada.

55.     Although Ms. Zenger-Benada was not "terminated," the Board decided that she should be granted a "due process hearing" since her position was being eliminated.

56.     At the conclusion of this executive session, Ms. Zenger-Benada filed a "grievance" against Dr. Douglas.

57.     Immediately after the grievance was filed, Askren motioned the Board to have a special executive session—without Dr. Douglas present—with the Board's attorney, Justin Ferrell, Director of Human Resources, Christine Wilson, and Vice President of Administrative Services, Amber Knoettgen.

58.     Askren claimed that such a meeting was necessary because employees would not feel comfortable speaking freely in front of Dr. Douglas.

59.     Askren's motion failed for lack of a second, and the Board agreed that, according to College policy, a grievance filed against the President should be investigated by an external party.

60.     Around this time, Askren asked one of the College's IT personnel, Tom Roberts, to check Dr. Douglas' and Pedro Leite's emails to see if they had been communicating about the restructuring that had been announced.

61.     On information and belief, Askren had never requested that IT search any other employees' emails.

62.     On information and belief, Askren thought that Dr. Douglas, as an African American woman, lacked the capacity to lead the reorganization effort by herself, and that Dr. Douglas' real motive in eliminating Ms. Zenger-Benada's old position was to silence dissent in her administration.

63.     On information and belief, Askren was upset with what he perceived as Dr. Douglas' lack of subservience to him and the Board in conducting the day-to-day operations of the College.

64.     ***Dr. Adrian Douglas' First Evaluation.*** In May 2019, the Board evaluated Dr. Adrian Douglas' performance for the first year of her employment as the College's President.

65.     Since it was the first Presidential evaluation that Board members Jesse Pounds and Pat MacFarlane were participating in, and since it was Dr. Douglas' first evaluation as the President, Board member Ellen Anderson had shared information with the Board and with Dr. Douglas about the evaluation process.

66.     According to Anderson, each member of the Board was to fill out a survey evaluating Dr. Douglas' performance in advance of the meeting.

67.     In addition, Dr. Douglas was supposed to provide the Board with a list of "accomplishments" for her first year, as well as any additional items that Dr. Douglas hoped to negotiate for the upcoming contract year.

68.     At approximately 10 a.m. on May 22, 2019—the same morning Ms. Zenger-Benada filed her grievance and spoke with the Board about her position being eliminated—Dr. Douglas met with the Board to discuss her annual evaluation.

69.     Although Henry was supposed to chair the meeting, Askren led the meeting and did the majority of the talking.

70.     When Dr. Douglas walked into the Board's meeting, the first thing Askren told her was that she had "forgotten" that she reported to the Board.

71.     Put differently, Askren told Dr. Douglas that she was not being subservient enough to him and the Board.

72.     The Board did not discuss the survey, and there was no discussion of Dr. Douglas' list of accomplishments or even opportunities for improvement.

73.     Henry told Dr. Douglas that the College was willing to continue her employment under the same terms as the Employment Contract that she had previously signed; she would receive no raise for her second year as the College's President.

74.     Dr. Douglas was the only employee of the College who did not receive a raise upon renewal of their 2019 contract.

75.     During the meeting, Dr. Douglas asked the Board if she was going to be able to discuss her accomplishments.

76.     Henry then mentioned that there had been "some negatives" in her performance.

77.     When Dr. Douglas asked what they were, Henry indicated that the Board did not have time to review the alleged negatives because other "people had been waiting."

78.     Dr. Douglas stated that she thought she had a right to see what was being used against her to justify the evaluation and the Board's resulting decision to not offer her a raise or additional benefits during her second year.

79.     Board member Ellen Anderson indicated in the meeting that she thought Dr. Douglas' request to hear the alleged negatives of her performance was a fair request.

80.     Led by Askren and Henry, however, the Board refused to tell Dr. Douglas what the alleged negatives of her performance were.

81.   Ultimately, to avoid the controversy that would have ensued had she not accepted the Board's renewal demand, Dr. Douglas agreed to sign the second year Employment Agreement, but only on the condition that the Board have a meeting with her to discuss the alleged negative aspects of her performance.

82.   The Board agreed, and so Dr. Douglas signed her new contract.

83.   ***Askren Targets Dr. Bruce Douglas.*** The next day, on or about May 23, 2019, Askren called Carleen Nordell, the College's Director of Community and College Activities, to inquire about vehicles that Dr. Bruce Douglas had checked out to take students in the Black Student Organization to church.

84.   On information and belief, Askren has not made any similar phone calls about other College employees.

85.   ***The Board's Refusal to Disclose Negatives Concerning Dr. Douglas' Performance.*** After her evaluation, Dr. Douglas had a difficult time getting the Board to actually tell her what the negatives were that had so concerned the Board.

86.   While Dr. Douglas was anxious to hear what caused the Board so much concern, the Board members began searching for additional information to retroactively justify their negative review of Dr. Douglas' performance.

87.   After the May 22nd review, for example, Board member Pat MacFarlane requested the "Climate Survey."

88.   Board member Tom Tuggle requested a list of the College's employees who had resigned during the last year. He later asked for the list for the prior three years.

89.   Then, when it appeared that a meeting between Dr. Douglas and the Board was going to occur, Askren refused to attend.

90.     After Askren failed to show up for one such Board meeting, MacFarlane indicated that she was going to speak with Askren to learn why he would not review the negative aspects of Dr. Douglas' performance with Dr. Douglas.

91.     In June 2019, Dr. Douglas asked MacFarlane if she had ever been able to contact Askren.

92.     MacFarlane indicated that she had contacted Askren, but she was aloof in describing any details of the conversation.

93.     Since that time, MacFarlane virtually stopped communicating with Dr. Douglas.

94.     During the next several weeks, the Board attempted to schedule multiple meetings with Dr. Douglas, but each time a meeting was scheduled, Askren failed to attend.

95.     The Board's chair, Henry, told Dr. Douglas that each of the Board's members needed to be present at the meeting, which effectively meant that Askren single-handedly kept Dr. Douglas from learning the alleged negatives of her performance—information that, even if Dr. Douglas had disagreed with the alleged negatives, would have enabled Dr. Douglas to address the issues raised.

96.     ***The Board Finally Shares its Alleged "Negatives" with Dr. Douglas.*** Eventually, in July 2019, for reasons that were never disclosed to Dr. Douglas, the Board gave up on attempting to secure Askren's attendance at the meeting.

97.     In July 2019, three Board members—Tom Tuggle, Ellen Anderson, and Pat MacFarlane—met with Dr. Douglas to discuss the alleged negative aspects of her performance.

98.     ***Negative #1—Dr. Douglas' Alleged Lies to the Board.*** The trio of Board members referenced several items, including their belief that Dr. Douglas had lied to the Board during the evaluation on May 22, 2019.

99.    At that meeting, Askren had asked her whether, prior to the announcement of the position restructuring discussed above, Dr. Douglas had talked to anyone "at the College" about the announcement.

100.    Dr. Douglas had responded at the May 22nd meeting that she had not talked with anyone "at the College" about the announcement, but that she had discussed it with the Board.

101.    Askren later changed his story and indicated that his question had been a different one—whether Dr. Douglas had talked to anyone on "the Board" about the restructuring prior to the announcement.

102.    The answer to this question, which is not the question that Askren had asked at the May 22nd meeting, would have been yes, since Dr. Douglas had shared the restructuring information with the Board prior to its announcement.

103.    Dr. Douglas viewed this criticism of her performance as odd given that later in the meeting, the Board criticized Dr. Douglas for not keeping the Board informed of campus ongoings, and also given that someone from the Board had apparently shared the news of the restructuring with Nancy Zenger-Benada (*i.e.*, the employee affected by the restructuring) before Dr. Douglas had the chance to speak with her about it.

104.    In other words, while Askren and the Board developed a shifting story in their efforts to show that Dr. Douglas had lied to the Board or somehow breached confidentiality requirements, the Board was seemingly not interested in learning which of its members had breached confidentiality requirements.

105.    ***Negative #2—MacFarlane Thinks Dr. Bruce Douglas' Salary is Excessive and that Dr. Adrian Douglas Lied About His Salary.*** The Board also thought that Dr. Douglas had

lied about Dr. Bruce Douglas' annual salary, which at the time was $14,000 for the part-time position that Bruce occupied.

106.    MacFarlane claimed that, during the Board's discussions about hiring Dr. Bruce Douglas, Dr. Adrian Douglas had said that the position would make "$11,000 per year or something like that." MacFarlane characterized this as a lie.

107.    Dr. Douglas had never told MacFarlane that Dr. Bruce Douglas would be making $11,000 per year.

108.    MacFarlane then commented that "some people" were upset that Dr. Bruce Douglas was making "so much money."

109.    On information and belief, MacFarlane herself thought that the Plaintiffs, combined, earned too much money.

110.    In any event, Dr. Douglas viewed this as an odd criticism of her own performance, given that her work had nothing to do with Dr. Bruce Douglas' salary, and given that the Board had approved Dr. Bruce Douglas' salary and hiring earlier that year.

111.    ***Negative #3—The Board Mistakenly Believed that Dr. Douglas Fired Those Who Disagreed with Her.*** Additionally, MacFarlane raised the criticism that Dr. Douglas had repeatedly fired people who did not agree with her.

112.    Dr. Douglas responded by asking how many people the Board believed she had recommended for termination.

113.    Anderson said, "Two," and MacFarlane said, "One."

114.    The correct answer was one; Dr. Douglas had recommended that the College terminate Kim Reynolds' position in 2018, a recommendation that the Board had supported.

115.    This criticism of Dr. Douglas repeatedly firing people who did not agree with her was flatly untrue, and it appears to reflect the Board's discomfort with Dr. Douglas, an African American woman, assertively exercising the authority of her position.

116.    ***Negative #4—The Board Thought Dr. Bruce Douglas "Begged" for Money.*** Next, the Board was upset with Dr. Douglas because Dr. Bruce Douglas had been, as Tuggle phrased it, out in the community "begging" for money to support various "Diversity, Equity, and Inclusion" ("DEI") initiatives that he had been promoting.

117.    In addition to wondering why Tuggle had used racially-charged language to describe Dr. Bruce Douglas' work, Dr. Douglas believed that this criticism was (again) unwarranted, since her performance had nothing to do with Dr. Bruce Douglas' activities.

118.    Notwithstanding the fact that Dr. Douglas was being criticized for something that she had not done, Plaintiffs saw it as telling that they, the only two African American employees of the College's Concordia campus, faced criticism for working hard to find funding for a program designed to foster diversity, equality, and inclusion.

119.    On information and belief, Askren did not support such initiatives and views them as part of the "failed experiment" that he referenced in his April 2021 Facebook post set forth above.

120.    ***Negative #5—Dr. Douglas' Travel Budget.*** The trio of Board members also expressed concerns about Dr. Douglas' travel budget.

121.    Dr. Douglas had traveled to several work-related conferences, but she had not exceeded her travel budget at the time these concerns were raised.

122.    Dr. Douglas asked the Board if she had exceeded her travel budget.

123.    The Board members responded that they did not know, and MacFarlane then stated that she wished she "could go to places like Chicago and San Diego and Washington, D.C.," all of which were places that Dr. Douglas had traveled during her first year with the College.

124.    MacFarlane neglected to point out that Dr. Douglas' travel to these places was for a Higher Learning Commission accreditation conference, an American Association of Community Colleges conference, and an Association of Community College Trustees conference.

125.    Dr. Douglas viewed this criticism as odd, because a Community College President's travel to such events would ordinarily be unremarkable.

126.    Dr. Douglas also viewed the criticism as odd because she had followed all of the College's protocols concerning travel and reimbursement.

127.    On information and belief, the College President's travel budget had not been the subject of past Presidential evaluations, even though previous College Presidents traveled to various functions in the same manner as Dr. Douglas, and even though the College's former President, Danette Toone, had attempted to claim mileage reimbursement for a trip that she had taken, at least in part, to see Ms. Toone's daughter.

128.    In other words, as it related to the budget and her travel, the Board was treating Dr. Douglas, an African American woman, differently than the College's past President, who was white.

129.    ***Negative #6—Dr. Douglas Uses the Word "I" Too Much.*** At the meeting, the Board members also relayed that Dr. Douglas used the word "I" too much in her conversations. The Board viewed this as a sign that Dr. Douglas was too autocratic in her administration.

130.    On information and belief, the Board had not criticized previous, Caucasian Presidents, for speaking in the first-person, acting with the authority of their position, or being autocratic.

131.    The Board, it seems, was criticizing Dr. Douglas for not conforming to its preconceived ideal of how an African American President of the College should conduct herself—by subserviently acquiescing to the Board's demands.

132.    ***Negative #7—The Board Claims to be in the Dark.*** The Board also claimed to be upset with "not knowing what was going on" at the College.

133.    The Board's members, however, had multiple lines of communication with Dr. Douglas and with other College employees.

134.    In addition, prior to this criticism being raised, Dr. Douglas had taken the initiative to set up Board trainings and an annual Board retreat, and to develop a Board handbook so that she and the Board could better understand their relationship and the types of communications they needed to have.

135.    Despite those efforts, the Board requested that Dr. Douglas begin sending periodic updates to the Board of ongoings at the College.

136.    Although she believed the criticism was unjustified, Dr. Douglas began, in August 2019, sending what she called "Board Bits," monthly updates intended to advise the Board of ongoing major projects and "big picture" things happening on campus.

137.    Dr. Douglas continued to send Board Bits to the Board each month thereafter.

138.    Given her efforts at communication both before and after the Board raised this criticism, it appears that the Board's continued desire for more communication and input reflected

the Board's position that it, rather than Dr. Douglas, should have had more control over the day-to-day operation of the College, and that Dr. Douglas should be more subservient to the Board.

139.    On information and belief, the Board had not sought to exercise such close oversight over its previous Caucasian Presidents.

140.    ***Tuggle Improperly Contacts Higher Learning Commission.*** In response to the unjustified intrusion of the Board on Dr. Douglas' day-to-day activities as College President, Dr. Douglas cautioned the Board that the College's accreditation body, the Higher Learning Commission, may be concerned if it perceived improper Board overreach into the duties of College administrators.

141.    Shortly after that conversation in October 2019, Dr. Douglas learned that Board member Tom Tuggle had improperly contacted the Higher Learning Commission—a contact that is typically reserved for a high-level College administrator.

142.    When Dr. Douglas asked Tuggle about the contact, he replied that the Higher Learning Commission had not indicated that he had done anything wrong, and so, his contact must have been permissible.

143.    Tuggle's willingness to go over Dr. Douglas' head by contacting the Higher Learning Commission, rather than address his concerns with Dr. Douglas directly or reach out through the College's liaison with the Higher Learning Commission, is a further reflection of Tuggle's and the Board's efforts to micromanage Dr. Douglas' work, rather than to permit her to exercise the appropriate authority of her position.

144.    ***Faculty Publish Letter to the Editor in Support of Administration.*** While the Board demonstrated a continuous pattern of concern that Dr. Douglas was not sufficiently

subservient to them in the way she conducted herself as the College President, the College faculty who worked with Dr. Douglas appear to have had no such issues.

145.    On or about December 6, 2019, the College's Faculty Association wrote a letter to the editor of the Concordia Blade Empire.[4]

146.    The letter indicated that the Faculty Association had been "reflecting on the multitude of achievements of the current academic administration[,]" that Dr. Douglas, as the President, had led.

147.    The Faculty Association praised Dr. Douglas for "reestablishing and rebuilding relationships" both within the College and between the College and the broader community, and for working to upgrade the College's facilities and improve working conditions for its employees.

148.    The Faculty Association noted that Dr. Douglas had "already been recognized for her service on a regional and national level," and had won multiple leadership awards in her short time at the College.

149.    The Faculty Association acknowledged that "change is difficult," but praised Dr. Douglas and the administration for taking necessary action to improve the College.

150.    The Faculty Association expressed its view that "[w]ith the current administration at the helm, we feel secure that we're steering in the right direction for both the college and the community at large."

151.    ***New Board Members.*** In early 2020, the Board gained two new members—Jim Koch and Richard Hubert, who took the places of Henry and Tuggle.

---

[4] *Letter to the Editor*, CONCORDIA BLADE-EMPIRE (Dec. 6, 2019), https://www.bladeempire.com/opinion/letter-editor-12-6-19.

152.    In April 2020, Board member Jim Koch, who on information and belief disagreed with Dr. Douglas' decision to terminate Kim Reynolds' employment two years earlier, claimed to have an "issue" with faculty contracts that the College was preparing to enter into.

153.    Koch indicated that he would be removing the faculty contracts from the "consent" portion of the Board's April 28th meeting.

154.    Confusingly, Koch said that he thought it was important that the Board discuss non-tenured faculty members whose contracts were not being renewed; but there were no such contracts.

155.    In advance of the Board's meeting, Diane Leif (Assistant to President and Board Liaison), Chris Wilson (Director of HR), and Dr. Douglas attempted to answer questions that Koch had concerning the faculty contracts.

156.    Koch did not seem to understand that removing the faculty contracts from the consent portion of the Board's agenda was something that caused the faculty significant anxiety.

157.    Never quite explaining what his concerns were, though, Koch refused to move the faculty contract issue back to the "consent" portion of the Board's April 28th meeting agenda.

158.    In her role as Board Liaison, Diane Leif is able to see all messages sent between Board members through their official email.

159.    On April 27th, after seeing a number of emails from Board members about the faculty contract issue, Ms. Leif sent an email to the Board's members reminding them to be careful of conducting what is known as a "serial meeting," which would be unlawful.

160.    A serial meeting occurs when members of a governing body have a series of smaller gatherings or communications that result in a majority of the body collectively taking action, even if a majority is never part of any one communication.

161.    On information and belief, Ms. Leif intended this email to be a polite reminder to the Board to be mindful of their public obligations in the midst of their communications, and not a threat to the Board or to any particular Board members.

162.    MacFarlane responded to Diane's email and said, "Accusation unfounded. Duly noted," as if she was keeping score.

163.    On information and belief, Askren was also put out by Ms. Leif's reminder, which he saw as something that had to have come from Dr. Douglas herself.

164.    Several days later, Askren asked Dr. Douglas if she had asked Ms. Leif to send the email as a way to threaten the Board with criminal sanctions.

165.    Dr. Douglas, who had not instructed Ms. Leif send the email, responded that she did not believe Ms. Leif intended her email as a threat in anyway.

166.    At the Board meeting on April 28th, Koch moved to discuss the faculty contracts, and when the topic came up for discussion, he said that he did not feel as if the Board had been provided enough information about the contracts.

167.    No other Board members said anything though, since the information that Dr. Douglas and the administration had provided to the Board concerning the faculty contracts was the same information as had always been provided to the Board.

168.    On information and belief, Koch did not have any serious questions about the faculty contracts, but rather wanted to embarrass Dr. Douglas and the administration.

169.    After his grandstanding about an alleged lack of information, Koch moved to approve the faculty contracts, which the Board unanimously approved.

170.    ***Dr. Douglas' Second Evaluation.*** During the Board meeting on April 28, 2020, the Board advised Dr. Douglas that her second evaluation would occur on May 8, 2020.

171.    In the leadup to that meeting, the six Board members and the two College Vice Presidents, Pedro Leite and Amber Knoettgen, completed anonymous Presidential Performance Evaluation surveys evaluating Dr. Douglas' performance.

172.    On May 6, 2020, Dr. Douglas received the results of the Presidential Performance Appraisal survey.

173.    The survey's results were positive, with the bulk of the feedback being in the "meets" to "exceeds" expectations categories.

174.    The survey did indicate that not all reviewers were satisfied with Dr. Douglas' performance in some respects, and it contained comments and criticisms that were the same as or similar to the prior year's criticisms that the Board reluctantly shared with Dr. Douglas months after her actual evaluation in 2019.

175.    One comment indicated frustration with the fact that Dr. Douglas had hired her husband, Dr. Bruce Douglas.

176.    The commenter was seemingly unaware of the fact that the Board had approved Dr. Bruce Douglas' hiring, and that he had been hired more than a year before the review in question. This criticism was both untimely and unwarranted.

177.    However, other reviewers appeared clearly happy with Dr. Douglas' performance.

178.    One reviewer applauded her "stunning list of accomplishments."

179.    Another described her as "one of those rare leaders who can think and execute strategically and be a first-rate manager of the day [i]n, day out routine of a college."

180.    While nearly all of the reviewers indicated that Dr. Douglas could improve in certain areas, four out of the five who left a final set of comments expressed generally positive views of her leadership.

181.    One reviewer praised Dr. Douglas' performance under the uncertainty created by the pandemic and noted that, while they could not recommend a raise for her, that was "due to the uncertain times being faced by the college," rather than due to any concern with her performance.

182.    Another expressed appreciation for "the new organizational structure, her current administration, and . . . the excellent work" that Dr. Douglas and her administration were doing for the College.

183.    A third noted a desire to see quicker progress on rolling out new programs, but expressed appreciation for Dr. Douglas' work to bring "more individual accountability to employees who fail to perform up to expectations."

184.    A fourth reviewer noted that Dr. Douglas "has earned the respect of those that had the privilege to work with her."

185.    While the reviews are anonymized, it is clear that at least two, and possibly more, of these generally positive reviews were written by members of the Board.

186.    All of the reviews were written within ten days of the Board's decision to terminate Dr. Douglas' employment.

187.    ***The Board's Termination of Dr. Adrian Douglas' Employment.*** In advance of the May 8th evaluation meeting, the Board indicated that it would first convene in an executive session with the College's Vice Presidents, and then call Dr. Douglas in for her review at the appropriate time.

188.    A few days before the May 8th meeting, MacFarlane sent an email requesting separate executive sessions with each of the College's Vice Presidents, Pedro Leite and Amber Knoettgen.

189.    On or about May 6th or 7th, either Askren or Koch sent Diane Leif an email pushing to have the May 8th Board meeting in person.

190.    At the time, all Board meetings were conducted virtually due to COVID-19 restrictions.

191.    The Board's Chair, Jesse Pounds, determined that this meeting, as all other Board meetings, would be held virtually.

192.    On May 8th, the Board went into executive session several times to discuss matters behind closed doors.

193.    On information and belief, some members of the Board, including Askren and Koch, had decided before May 8th that they would push for the termination of Dr. Douglas, and those members used the executive sessions to lobby for their position and to push for unanimity on the decision to terminate Dr. Douglas' employment without giving her a chance to respond.

194.    For the final executive session, the Board called Dr. Douglas into the meeting.

195.    Before anyone else spoke, the Board's attorney, Justin Ferrell, informed Dr. Douglas that the Board had decided not to renew her contract.

196.    The Board never discussed its second evaluation of Dr. Douglas with her, and it never gave Dr. Douglas an opportunity to discuss her accomplishments from the prior year.

197.    Dr. Douglas asked Mr. Ferrell for a reason why the Board was terminating her employment.

198.    Mr. Ferrell told Dr. Douglas that the Board did not need to provide her with a reason.

199.    Confusingly, Mr. Ferrell then told Dr. Douglas that instead of being terminated, she could resign.

200.    Since she was, in fact, being terminated, she declined Mr. Ferrell's invitation.

201.    That final executive session lasted a total of four minutes, after which time the Board returned to open session.

202.    Back in open session, Askren formally moved to not renew Dr. Douglas' contract.

203.    Koch immediately seconded the motion, and the full Board voted unanimously for termination of Dr. Douglas' employment without public debate and without giving Dr. Douglas the opportunity to respond.

204.    Immediately following the announcement, the locks were changed in Dr. Douglas' office, as if Dr. Douglas was going to steal something from the College.

205.    The Board had not changed the locks for the offices of Kim Reynolds or Nancy Zenger-Benada, both of whom are Caucasian.

206.    This difference appears to reflect the Board's view that Dr. Douglas, an African American woman, could not be trusted or would be inclined to steal College property or otherwise harm the College, even though the Board did not hold similar views about its former white employees.

207.    ***The Board's Termination of Dr. Bruce Douglas' Employment.*** Within minutes of terminating Dr. Douglas' employment, the Board appointed an interim President for the College, Amber Knoettgen.

208.    Ms. Knoettgen then, without explanation, summarily terminated Dr. Bruce Douglas' employment.

209.    The Board did not follow the College's procedures and policies in terminating Dr. Bruce Douglas' employment.

210.    Terminations of that type are typically handled by the Vice President in charge of the employee in question.

211.    Pedro Leite was the Vice-Presidential supervisor over Dr. Bruce Douglas, but he was not consulted prior to the College's decision to terminate Dr. Bruce Douglas' employment.

212.    ***Faculty and Students Voice Concerns.*** In the days following the Board's abrupt, unexplained decision to terminate Drs. Adrian and Bruce Douglas, the College community expressed serious concerns with the decision.

213.    On or about May 9, 2020, the College's Faculty Association ("Faculty Association") sent a letter to the Board, criticized the Board for "hid[ing] behind a legal technicality, rather than explaining "the ethical, financial, and moral merits" of its decision to terminate Dr. Douglas and "upend one of the few bits of security" that the College had in the midst of a global health crisis and with an accreditation recertification visit upcoming. That letter is attached hereto and incorporated herein by reference as **Exhibit C**.

214.    The Faculty Association asked the Board for a reason why the Board had so suddenly terminated Dr. Douglas' employment, but the Board, at its counsel's direction, did not provide a reason.

215.    On or about May 26, 2020, at a regularly scheduled Board meeting, several faculty members voiced continued concern with the Board's decision.[5]

216.    One faculty member described the Board's decision to terminate Dr. Douglas without giving her a chance to respond to the Board's concerns as "reprehensible."

---

[5] *Trustees Hear Concerns About Non-Renewal of Contracts*, CONCORDIA BLADE-EMPIRE (May 27, 2020), https://www.bladeempire.com/news/trustees-hear-concerns-about-non-renewal-contracts.

217.    Another, commenting on the Board's seeming rush to judgment and lack of explanation, expressed her "hope that some Board members did not let their personal biases or preferences cloud their judgment."

218.    A third faculty member stated that her belief that the Board's unreasoned, unexplained decision tore at the integrity of the community and violated the guiding principles of the College.

219.    Additionally at the May 26 meeting, Dr. Sue Darby, a volunteer peer reviewer with the Higher Learning Commission who was consulting for the College on the accreditation process, told the Board that its sudden decision to terminate Dr. Douglas without a succession plan in place could create difficulties for the College on its accreditation review.

220.    Dr. Darby explained to the Board that "one of the things the [Higher Learning Commission] reviewers will look for is stability in leadership."

221.    On or about June 5, 2020, 15 members of the College faculty and staff sent a letter to the editor of the Concordia Blade-Empire, expressing their "support for President Adrian Douglas and the sadness and confusion felt from her nonrenewal."[6]

222.    The 15 faculty and staff members praised "President Douglas' part in [the College] being named the 'Best Community College in the Nation' by SmartAsset."

223.    The faculty and staff members described Drs. Adrian and Bruce Douglas as "two employees . . . of critical importance to the College," and noted that their termination without cause or a chance to improve "is simply not done with employees that are valued."

---

[6] *Some CCCC Staff Issue No Confidence Declaration in Board of Trustees*, CONCORDIA BLADE-EMPIRE (June 5, 2020), https://www.bladeempire.com/news/some-cccc-staff-issue-no-confidence-declaration-board-trustees.

224.    The faculty and staff members were confused by the decision in part because the Board itself had "obviously recognized [Dr. Douglas'] accomplishments as they voiced such at several meetings" and in her recent evaluation.

225.    For the way Drs. Adrian and Bruce Douglas were treated, and the complete lack of any explanation given for their termination, the faculty members made "a Declaration of NO CONFIDENCE in the Board of Trustees."

226.    On or about June 25, 2020, two College students who were organization leaders on campus wrote a letter to the Board that was published in the Junction City Union, joining in the show of community support for Drs. Adrian and Bruce Douglas. That letter is attached hereto and incorporated herein by reference as **Exhibit D**.

227.    The students praised Drs. Adrian and Bruce Douglas for strengthening relationships between the community, students, staff, and faculty, and for making the College "feel more welcoming to students of all races, ethnicities, sexual orientations, etc."

228.    The students joined in the call of the June 5 faculty letter to declare "no confidence" in the Board.

229.    As described, Dr. Adrian Douglas and Dr. Bruce Douglas enjoyed broad support throughout the College community, including in many public statements by the Board or its members. The one place on campus that support seemed to be lacking was in the Board's closed-door, executive sessions, where Askren and others could express their true feelings about two of the College's only African American employees, and its first ever African American President, with no chance of public disclosure.

230.    ***Charges of Discrimination.*** On or about August 17, 2020, Drs. Adrian and Bruce Douglas filed Charges of Discrimination with the Equal Employment Opportunity Commission.

231.    On or about July 7, 2021, the Department of Justice issued Dr. Adrian Douglas and Dr. Bruce Douglas a Notice of Right to Sue.

## COUNT I – RACE/SKIN COLOR DISCRIMINATION – TITLE VII
## DR. ADRIAN DOUGLAS' CLAIM AGAINST THE COLLEGE

232.    Plaintiff Dr. Adrian Douglas incorporates herein the allegations set forth above.

233.    Dr. Douglas, who is an African American black woman, is a member of a protected class.

234.    She was qualified for her position as the College's President, and she was more than satisfactorily performing her job.

235.    As set forth above, the Board decided to not renew Dr. Douglas' contract, and it terminated her employment effective immediately, under circumstances giving rise to an inference of discrimination based on Dr. Douglas' race and skin color.

236.    The Board's conduct caused Dr. Douglas damage to her career, her reputation, and her sense of self in a number of ways compensable by Title VII.

WHEREFORE, Plaintiff Dr. Adrian Douglas respectfully requests that the Court enter judgment in her favor and against Defendant Board of Trustees of Cloud County Community College for damages to be proven at trial; and for such other relief as the Court deems just and proper in the circumstances.

## COUNT II – RACE/SKIN COLOR DISCRIMINATION – TITLE VII
## DR. BRUCE DOUGLAS' CLAIM AGAINST THE COLLEGE

237.    Plaintiff Dr. Bruce Douglas incorporates herein the allegations set forth above.

238.    Dr. Bruce Douglas, who is an African American black man, is a member of a protected class.

239.    He was qualified for his position as the College's Coordinator of Student Engagement, and he was more than satisfactorily performing his job.

240.    As set forth above, the Board decided to not renew Dr. Bruce Douglas' contract, and it terminated his employment effective immediately, under circumstances giving rise to an inference of discrimination based on Dr. Bruce Douglas' race and skin color.

241.    The Board's conduct caused Dr. Bruce Douglas damage in a number of ways compensable by Title VII.

WHEREFORE, Plaintiff Dr. Bruce Douglas respectfully requests that the Court enter judgment in his favor and against Defendant Board of Trustees of Cloud County Community College for damages to be proven at trial; and for such other relief as the Court deems just and proper in the circumstances.

## COUNT III – VIOLATION OF 42 U.S.C. § 1981
### DR. ADRIAN DOUGLAS' CLAIM AGAINST DEFENDANTS

242.    Plaintiff Dr. Adrian Douglas incorporates herein the allegations set forth above.

243.    Dr. Douglas, who is an African American black woman, is a member of a protected class.

244.    She was qualified for her position as the College's President, and she was more than satisfactorily performing her job.

245.    As set forth above, Defendants decided to not renew Dr. Douglas' contract, and they terminated her employment effective immediately, under circumstances giving rise to an inference of discrimination based on Dr. Douglas' race and skin color.

246.    Defendants' conduct caused Dr. Douglas damage to her career, her reputation, and her sense of self in a number of ways compensable by 42 U.S.C. § 1981.

WHEREFORE, Plaintiff Dr. Adrian Douglas respectfully requests that the Court enter judgment in her favor and against Defendant Board of Trustees of Cloud County Community College and against Defendant Gregory P. Askren for damages to be proven at trial; and for such other relief as the Court deems just and proper in the circumstances.

## COUNT IV – VIOLATION OF 42 U.S.C. § 1981
## DR. BRUCE DOUGLAS' CLAIM AGAINST DEFENDANTS

247.    Plaintiff Dr. Bruce Douglas incorporates herein the allegations set forth above.

248.    Dr. Bruce Douglas, who is an African American black man, is a member of a protected class.

249.    He was qualified for his position as the College's Coordinator of Student Engagement, and he was more than satisfactorily performing his job.

250.    As set forth above, Defendants decided to not renew Dr. Bruce Douglas' contract, and they terminated his employment effective immediately, under circumstances giving rise to an inference of discrimination based on Dr. Bruce Douglas' race and skin color.

251.    Defendants' conduct caused Dr. Bruce Douglas damage in a number of ways compensable by 42 U.S.C. § 1981.

WHEREFORE, Plaintiff Dr. Bruce Douglas respectfully requests that the Court enter judgment in his favor and against Defendant Board of Trustees of Cloud County Community College and against Defendant Gregory P. Askren for damages to be proven at trial; and for such other relief as the Court deems just and proper in the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for the foregoing causes of action.

## DESIGNATION OF PLACE OF TRIAL

Plaintiffs hereby request the trial be held in Kansas City, Kansas.

## CIVIL COVER SHEET

A copy of Plaintiffs' Civil Cover Sheet is attached hereto as **Exhibit E**.

**HKM EMPLOYMENT ATTORNEYS LLP**

By:    */s/ Brad K. Thoenen*
Brad K. Thoenen, KS 24479
bthoenen@hkm.com
John J. Ziegelmeyer III, KS 23003
jziegelmeyer@hkm.com
1501 Westport Road
Kansas City, Missouri 64111
816.875.9339

ATTORNEYS FOR PLAINTIFFS