## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| DR. ADRIAN DOUGLAS and<br>DR. BRUCE DOUGLAS, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 21-2400-KHV |
| | ) | |
| THE BOARD OF TRUSTEES OF CLOUD<br>COMMUNITY COLLEGE, and<br>GREGORY P. ASKREN, in his<br>individual capacity | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Dr. Adrian Douglas and Dr. Bruce Douglas filed suit against the Board of Trustees of Cloud Community College and Gregory Askren, alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 et seq., and 42 U.S.C. §§ 1981 and 1983. See Amended Complaint (Doc. #21) filed January 21, 2022. This matter is before the Court on Defendants' Motion To Dismiss Amended Complaint (Doc. #25) filed February 4, 2022. For the reasons stated below, the Court overrules defendants' motion.

## Legal Standard

In ruling on defendants' motion to dismiss for failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P., the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement for relief. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible—and not merely conceivable—on its face. Id. at 679–80; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In determining whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense. Iqbal,

556 U.S. at 679.

The Court need not accept as true those allegations which state only legal conclusions. See id.; United States v. Herring, 935 F.3d 1102, 1110 (10th Cir. 2019). Plaintiffs bear the burden of framing their claims with enough factual matter to suggest they are entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by conclusory statements. See Twombly, 550 U.S. at 556. Plaintiffs make a facially plausible claim by pleading factual content from which the Court can reasonably infer that defendants are liable for the alleged misconduct. Iqbal, 556 U.S. at 678. Plaintiffs must show more than a sheer possibility that defendants have acted unlawfully—it is not enough to plead facts that are "merely consistent" with defendants' liability. Id. (quoting Twombly, 550 U.S. at 557). A pleading which offers labels and conclusions, a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement will not stand. Id. Similarly, where the well-pleaded facts do not permit the Court to infer more than mere possibility of misconduct, the pleading has alleged—but has not "shown"—that the pleader is entitled to relief. Id. at 679. The degree of specificity necessary to establish plausibility and fair notice depends on context, because what constitutes fair notice under Rule 8(a)(2), Fed. R. Civ. P., depends on the type of case. Robbins v. Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008).

**Factual Background**

Plaintiffs' first amended complaint alleges as follows:

Cloud County Community College is a public community college with campuses in Concordia and Junction City, Kansas. The Board of Trustees governs the College. Dr. Adrian Douglas ("Dr. Adrian") is African American, and she previously served as the President of the College. Dr. Bruce Douglas ("Dr. Bruce"), her husband, is also African American. He previously

served as Coordinator of Student Engagement at the College.  Gregory Askren, who resides in Concordia, Kansas, was a Board member during all relevant times.

## I.        The Board Of Trustees

The Board has six members.  It holds elections in November of every odd year, and newly elected Board members start their terms in January of the following year.  In 2017, Board members included Linda Richard, who served as the Chair, Askren, David Clemons, Larry Henry, Tom Tuggle and Ellen Anderson (collectively, the "2017 Board").  After an election in November of 2017, the 2018 Board members were Askren (Chair), Henry, Tuggle, Anderson and new additions Jesse Pounds and Pat MacFarlane (collectively, the "2018 Board").  In 2019, Askren remained on the Board but Henry took over as Chair.  After an election in 2019, the 2020 Board Members were Pounds (Chair), Askren, Anderson, McFarlane and new additions Jim Koch and Richard Hubert (collectively, the "2020 Board").  Each Board member is Caucasian.

## II.       Dr. Adrian's Employment

Some time between 2017 and 2018, Dr. Adrian applied and interviewed for the presidency with the 2017 Board.  Though she was the search committee's first choice, the Board offered the position to Dr. Mark Smith, a Caucasian.  Dr. Smith accepted the position but abruptly resigned a month later.  Upon his resignation, without engaging in another search process, the College offered the position to Dr. Adrian.

On April 5, 2018, Dr. Adrian signed an employment contract with the College and became its first African American President.  The contract categorized her as a "Regular Administrator." The contract had an initial term from May 9, 2018 through June 30, 2019, and an annual salary of $145,000.  The College agreed that the parties would determine any salary increase for future years at a later date.  Askren served as Chair when Dr. Adrian signed her contract.

### III.    Dr. Adrian's Presidency

In or around August of 2018, Dr. Adrian recommended that the College terminate the Vice President of Student Affairs and Advancement, Kim Reynolds.  The Board approved Dr. Adrian's recommendation by a vote of four to two, with Askren and Henry voting to retain Reynolds. Askren was upset with the recommendation because he was a social friend of Reynolds and he wanted more of a say in the decision.

In early 2019, the College posted a job opening for the position of Coordinator of Student Engagement.  Pedro Leite, the interim Vice President of Student Affairs and Advancement, led a search committee to fill the position because he supervised the position.  The search committee, including Leite and Dr. Adrian, interviewed five or six candidates.  Dr. Bruce applied for the position.  Despite his qualifications, the search committee ranked him fourth on their list of applicants.

Dr. Adrian disagreed with the search committee rankings and believed that Dr. Bruce was most qualified.  Dr. Adrian recommended that the Board hire him and discussed her reasoning in an executive session with the Board.  Before the Board voted on hiring Dr. Bruce, someone on the Board or the search committee breached confidentiality requirements and leaked the search committee's rankings to the public.

Ultimately, the Board voted to hire Dr. Bruce by a four to two vote.  Again, both Askren and Henry voted against Dr. Adrian's recommendation.  On or around January 29, 2019, the College hired Dr. Bruce part time, and he signed an employment contract with an annual salary of $14,000.

### A.  Dr. Adrian's Restructuring Plan

In spring of 2019, Dr. Adrian recognized a need to restructure certain administrative

positions.  Her plan would combine two vice president positions, the Vice President of Academic Affairs and the Vice President of Student Affairs and Advancement, into one new position—the Vice President of Academic Affairs and Student Success.  Nancy Zenger-Benada served as Vice President of Academic Affairs, and Leite was the Vice President of Student Affairs and Advancement.  On May 6, 2019, Dr. Adrian shared the restructuring proposal with the Board and asked it not to share the proposal with anyone because she wanted to first discuss it with the individuals whose positions would be affected.

A day later, during a cabinet meeting, Zenger-Benada's conduct suggested that she knew about the plan to eliminate her position.  Someone from the Board had leaked the confidential information to "stir up trouble."  That day, Dr. Adrian shared the restructuring proposal with Zenger-Benada and Leite, encouraging them to apply for the newly created role of Vice President of Academic Affairs and Student Success.  Zenger-Benada did not apply for it and the Board ultimately hired Leite.

On May 22, 2019, the Board went into an executive session with Zenger-Benada to discuss the restructuring plan.  Although the Board did not terminate her employment, the Board decided to grant her a "due process hearing" because the restructuring plan eliminated her position.  After the executive session, Zenger-Benada filed a grievance against Dr. Adrian.  Immediately afterward, Askren motioned the Board to hold a special executive session without Dr. Adrian, but including Board attorney Justin Ferrell, Director of Human Resources Christine Wilson and Vice President of Administrative Services Amber Knoettgen.  Askren claimed that the special session was necessary because employees would not feel comfortable speaking freely in front of Dr. Adrian.

No one seconded Askren's motion, so the Board never convened the special session.

Instead, following college policy, the Board agreed that an external party should investigate the grievance against the President.  Around this time, Askren asked Tom Roberts, one of the College's IT staff members, to check the emails of Dr. Adrian and Leite to see if they had communicated about the restructuring plan.  Askren had not previously requested that IT search any other employee emails.

B.  First Performance Evaluation

In May of 2019, during the reorganization, the Board conducted Dr. Adrian's first performance evaluation as President.  Before this, Pounds and MacFarlane had never participated in a presidential performance evaluation, so Anderson explained how the process would work. According to Anderson, before the meeting, each member of the Board would fill out a survey evaluating Dr. Adrian's performance.   Anderson asked Dr. Adrian to provide a list of accomplishments for her first year and any items that she wished to negotiate for the upcoming contract year.

On May 22, 2019, the day that Zenger-Benada filed her grievance, Dr. Adrian met with the Board about her annual evaluation.  Although Henry was supposed to chair the meeting, Askren did so.  Askren said that Dr. Adrian was not subservient enough to the Board or to him.  He told her that she had "forgotten" that she reported to the Board.  The Board did not discuss the performance surveys, Dr. Adrian's accomplishments or opportunities for her to improve.  Henry told Dr. Adrian that the College was willing to continue her employment under the original terms, but that she would not receive a raise in her second year.  Dr. Adrian was the only College employee who did not receive a raise.

After this, Dr. Adrian asked the Board if she would be able to discuss her accomplishments. Henry only then mentioned that her performance had "some negatives."  When Dr. Adrian asked

about them, Henry indicated that the Board did not have time to review them because "people had been waiting." Dr. Adrian expressed her belief that she had a right to see the alleged negatives as they affected her performance evaluation and 2019 contract terms. Anderson believed that Dr. Adrian's request was fair, but the Board refused to comply. Ultimately, to avoid controversy, Dr. Adrian agreed to sign the second-year employment agreement, but with the condition that the Board meet with her to discuss the alleged negative aspects of her performance. The Board agreed and Dr. Adrian signed her new contract.

The following day, Askren called Carleen Nordell, the College's Director of Community and College Activities, inquiring about vehicles which Dr. Bruce had borrowed to take students in the Black Student organization to church. Askren has not made similar phone calls about other College employees.

Dr. Adrian attempted to contact the Board about the negatives associated with her performance evaluation. While she waited anxiously for a response, the Board began searching for additional information to retroactively justify its negative performance review.

The Board and Dr. Adrian eventually agreed to discuss her performance evaluation, but Askren refused to attend the meeting. After this, MacFarlane indicated that she would ask Askren why he would not meet with Dr. Adrian to discuss her evaluation. In July of 2019, Dr. Adrian followed up with MacFarlane about this, but MacFarlane did not provide details about her conversation with Askren. After that conversation, MacFarlane stopped communicating with Dr. Adrian altogether. The Board continued to attempt to schedule meetings with Dr. Adrian, but each time a meeting was scheduled, Askren did not attend. Henry told Dr. Adrian that all Board members had to be present to hold a meeting. In July of 2019, for reasons not disclosed to Dr. Adrian, the Board gave up attempting to secure Askren's attendance at the meeting. Three Board

members—Tuggle, Anderson and MacFarlane—met with Dr. Adrian and listed numerous issues with her performance.

First, the Board members stated that Dr. Adrian had lied during her evaluation on May 22, 2019.  At that meeting, Askren had asked Dr. Adrian whether she had discussed the restructuring plan with any college employee before the announcement.  Dr. Adrian answered by saying no, but that she had discussed it with the Board.  Askren later stated that he asked a different question: whether, prior to the announcement, she had talked to anyone on the Board about the restructuring plan.  The answer to this question would have been yes.  Dr. Adrian was confused with this performance critique, because later in the meeting the Board members criticized her for not keeping them informed of "campus ongoings."

The Board members also stated that Dr. Adrian had lied about Dr. Bruce's annual salary. MacFarlane stated that during the Board's discussions about the position, Dr. Adrian stated that the position would pay "$11,000 or something like that."  MacFarlane commented that "some people" were upset that Dr. Bruce made so much money.  MacFarlane thought that Dr. Adrian and Dr. Bruce, combined, earned too much money.  Dr. Adrian's salary was unrelated to Dr. Bruce's salary.

The Board members also criticized Dr. Adrian's firing decisions, claiming that she fired people who repeatedly did not agree with her.  Dr. Adrian responded by asking how many people the Board believed she had recommended for termination.  Anderson answered, "two," and MacFarlane said, "one."  Dr. Adrian had only recommended that the College terminate Reynolds, and the Board supported that recommendation.

The Board members were also upset with Dr. Adrian because, as Tuggle phrased it, Dr. Bruce had been out in the community "begging" for money to support various Diversity, Equity

and Inclusion ("DEI") initiatives.  Askren did not support DEI programs and initiatives on campus.

The trio of Board members also expressed concerns about Dr. Adrian's travel budget.  Dr. Adrian traveled to several work-related conferences but did not exceed her travel budget.  When Dr. Adrian asked if she had exceeded her travel budget, the Board members answered that they did not know.  MacFarlane stated that she wished "she could go to places like Chicago and San Diego and Washington, D.C."  Dr. Adrian traveled to all three cities in her first year as President. MacFarlane never acknowledged that Dr. Adrian visited these three places for work-related conferences, not personal travel.  It was not unusual for a community college president to attend these conferences, and Dr. Adrian followed every travel and reimbursement protocol.  Previous presidents had also traveled to various functions, but the Board did not discuss their travel budgets during their evaluations.  Danette Toone, a former College president, even attempted to claim mileage reimbursement for a trip that she had taken, at least in part, to visit her daughter.  The Board members also told Dr. Adrian that she used "I" too much in her conversations.  The Board had not criticized previous Caucasian presidents for speaking in the first person or acting with authority.

Last, the Board members complained that they did not know what was going on in the College.  The Board members had multiple lines of communication, however, with Dr. Adrian and other College employees.  Before her evaluation, Dr. Adrian set up trainings and an annual Board retreat so that she and the Board could communicate better.  She developed a Board handbook to assist in this goal.  At the meeting, the Board members requested that Dr. Adrian begin sending periodic updates about the day-to-day activities at the College, which Dr. Adrian implemented in August of 2019.  The Board did not exercise this kind of oversight over previous Caucasian presidents.

C.  The Higher Learning Commission

After listening to the explanation of her performance evaluation, Dr. Adrian cautioned the Board that the College's accreditation body, the Higher Learning Commission ("Commission"), might be concerned with its overreach.  In October of 2019, a few months after this conversation, Dr. Adrian learned that Tuggle had improperly contacted the Commission.  Typically, only a high-level College administrator would contact the Commission, not Board members.  When Dr. Adrian asked Tuggle about the contact, he replied that he did nothing wrong and that the Commission did not correct him.

D.  Faculty Opinions

Though the Board continued to express concerns about Dr. Adrian's actions as President, College faculty who worked with her did not share these concerns.  On December 6, 2019, the College's Faculty Administration wrote a letter to the editor of the Concordia Blade Empire, the local newspaper for Concordia.  The letter indicated that the Faculty Association had been "reflecting on the multitude of achievements of the current academic administration" that Dr. Adrian led as President.  The Faculty Association praised her for "reestablishing and rebuilding" relationships within the College and the broader community, upgrading the College's facilities and improving working conditions for employees.  The article noted that Dr. Adrian had "already been recognized for her service on a regional and national level" and won multiple leadership awards in her short time at the College.

E.  New Board Members

In early 2020, Koch and Hubert replaced Henry and Tuggle on the Board.  Koch had disagreed with Dr. Adrian's decision to terminate Reynolds' employment back in 2018.  In April of 2020, Koch claimed to have an issue with faculty contracts that the College was preparing to

sign.  He stated that he would be removing the faculty contracts from the "consent" portion of the agenda for the Board meeting on April 28.  In advance of the meeting, Diane Leif (Assistant to the President and Board Liaison), Wilson (Director of Human Resources) and Dr. Adrian attempted to answer Koch's questions about faculty contracts.  Knowing that this would cause anxiety to the faculty, Koch refused to change his mind about the issue.

As Board Liaison, Leif can see all messages between Board members through their official school email.  A day before the scheduled Board meeting, Leif sent the Board an email after seeing several emails about the faculty contract issue.  The email reminded them to be careful of conducting what is known as a "serial meeting," which is "unlawful."  A serial meeting occurs when members of a governing body have a series of small gatherings or communications that result in a majority of the body collectively acting, even if a majority is never part of any one communication.  Leif intended the email to be a polite reminder to the Board about their public obligations during their communications, not as a threat.  Askren did not appreciate this reminder and felt that the reminder was coming directly from Dr. Adrian.  When Askren asked Dr. Adrian if she had asked Leif to threaten the Board with criminal sanctions, she denied it.  Even though Koch was the only Board member to express an opinion about the faculty contracts, he eventually moved to approve the contracts, and the Board unanimously approved them.

F.  Dr. Adrian's Second Evaluation

At the meeting on April 28, Dr. Adrian learned that her second performance evaluation would occur on May 8, 2020.  In the leadup to the meeting, the six Board members and two vice presidents, Leite and Knoettgen, completed anonymous Presidential Performance Evaluation surveys for Dr. Adrian.  Two days before the meeting, Dr. Adrian received the survey results.  The results were positive, with most of the feedback in the "meets" to "exceeds" expectation categories.

She received praise about her management style, her performance under the uncertainty created by the pandemic, her new organizational structure and her work to bring more individual accountability to unnamed employees not performing up to expectations.  Almost all reviewers found areas for improvement, but four out of five who left a final set of comments expressed generally positive views of Dr. Adrian's leadership.  The survey did indicate that not all reviewers were satisfied with Dr. Adrian's performance, and contained comments and criticisms similar to the prior year's evaluation.  All reviewers wrote their comments before the Board's decision to terminate Dr. Adrian's employment.

## IV.    The Board's Termination Of Drs. Adrian And Bruce's Employment

In advance of the evaluation meeting set for May 8, the Board indicated that it would hold an executive session "behind closed doors" with the College vice presidents, and then call in Dr. Adrian for her review.  A few days before the meeting, MacFarlane sent an email requesting separate executive sessions with each vice president, Leite and Knoettgen.  Before the meeting, some Board members, including Askren and Koch, decided to push for the termination of Dr. Adrian's employment.  They used the executive session to lobby for their position and to push for unanimity on the termination decision without allowing her to respond.

As Dr. Adrian entered the final executive session, Ferrell, the Board attorney, informed her that the Board would not be renewing her contract.  The Board did not discuss Dr. Adrian's second performance evaluation or allow her to discuss her accomplishments.  When Dr. Adrian asked Ferrell why the Board was terminating her employment, he responded that he did not need to provide a reason.  Ferrell told Dr. Adrian that instead of being terminated, she could resign.  She declined that offer.

This final executive session lasted only four minutes, after which the Board returned to the

open session.  In the open session, Askren formally moved not to renew Dr. Adrian's contract.

Koch seconded the motion, and the Board voted to unanimously terminate her employment

without public debate or chance to respond.  The College immediately changed the locks on her

office.  The College did not take this action with previous employees Reynolds or Zenger-Benada,

both of whom are Caucasian.

The Board appointed Knoettgen to serve as interim President.  Without explanation,

Knoettgen summarily terminated Dr. Bruce's employment without following College procedures

and policies.  According to College policy, the vice president in charge of Dr. Bruce should have

handled the termination.  Leite, Dr. Bruce's vice president supervisor, was not consulted about the

decision.

## V.      Faculty And Student Concerns

After the Board terminated plaintiffs' employment, the College community expressed

serious concerns about both decisions.  On May 9, 2020, the Faculty Association sent a letter to

the Board, criticizing the decision and asking the Board to provide a reason for the sudden

terminations.  The Board did not provide one.  On May 26, 2020, at a regularly scheduled Board

meeting, several faculty members voiced continued concern with the Board's decision.  Dr. Sue

Darby, a volunteer peer reviewer for the Commission, told the Board that the sudden decision to

terminate Dr. Adrian without a succession plan could create difficulties for the College's upcoming

accreditation review.

On June 5, 2020, College faculty and staff members wrote another letter to the editor of

Concordia Blade Empire, expressing their "support for Adrian Douglas," speaking highly of both

her and Dr. Bruce's legacy on campus.  The faculty members made a Declaration of "No

Confidence" in the Board, with students joining this movement soon afterwards.

## VI.     Charges of Discrimination

On August 17, 2020, Drs. Adrian and Bruce filed Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC").   On July 7, 2021, the Department of Justice issued them Notices of Right to Sue.

Plaintiffs' amended complaint alleges the following claims: race discrimination against Dr. Adrian in violation of Title VII (Count 1); race discrimination against Dr. Bruce in violation of Title VII (Count 2); race discrimination against Dr. Adrian in violation of Sections 1981 and 1983 (Count 3); and race discrimination against Dr. Bruce in violation of Sections 1981 and 1983 (Count 4).

### <u>Analysis</u>

Defendants argue that plaintiffs' amended complaint should be dismissed for failure to comply with Rule 8, Fed. R. Civ. P., and failure to state a claim on which relief may be granted.

## I.     Rule 8 Arguments

Defendants argue that plaintiffs' amended complaint should be dismissed because it does not contain a "short and plain statement of the claim showing the pleader[s] [are] entitled to relief." Fed. R. Civ. P. 8(a).   Plaintiffs argue that they included a significant level of factual detail in their complaint, which does not warrant dismissal.

Rule 8 serves the important purpose of requiring plaintiffs to "state their claims intelligibly so as to inform the defendants of the legal claims being asserted."   <u>Mann v. Boatright</u>, 477 F.3d 1140, 1147 (10th Cir. 2007).   Something written "more as a press release" and without the "simplicity, conciseness and clarity as to whom plaintiffs are suing for what wrongs" would violate Rule 8.   <u>Id.</u> at 1148.   Courts may ignore the "fat in the complaint, 'bypass the dross and get on with the case'" without dismissing the complaint.   <u>Valencia v. Bd. of Regents</u>, No. CV 17-00509

-14-

RB/SCY, 2017 WL 4325766, at *1 (D.N.M. Sept. 26, 2017) (quoting Garst v. Lockheed-Martin Corp., 328 F.3d 374, 378 (7th Cir. 2003) ("A district court is not authorized to dismiss a complaint merely because it contains repetitious and irrelevant matter . . ."). Dismissal under Rule 8 is only warranted in "extreme circumstances." Federal Civil Rules Handbook, 342–43 (2018).

Plaintiffs' complaint does not violate Rule 8's notice pleading requirements. Although some of the allegations are vague and conclusory, the complaint asserts sufficient factual detail about the allegedly discriminatory actions by the Board and Askren. The complaint allows the Court and defendants to discern a factual and legal basis for plaintiffs' claims. The Court therefore overrules defendants' motion to dismiss for failure to comply with Rule 8 and assesses the merits of each claim under Rule 12(b)(6).

## II.    Dr. Adrian's Title VII Claim (Count 1)

Dr. Adrian alleges that the Board discriminated against her on the basis of race by terminating her employment with the College in violation of Title VII.[1] The Board first argues that as College President, Dr. Adrian was not an employee but was "personal staff" of the Board and therefore not entitled to Title VII protection. The Board argues that because its six members are publicly elected, and it has plenary powers to appoint and remove the College president, Dr. Adrian should be considered "personal staff." The Board also argues that even if Dr. Adrian was an employee, she did not plead a claim on which relief may be granted.

Under Title VII, it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national

---

[1]    Dr. Adrian does not bring a Title VII claim against Askren.

origin." 42 U.S.C. § 2000e-2(a)(1).  To bring an action under Title VII, Dr. Adrian must be

considered an employee.  If she was an employee, she may establish a violation of Title VII by

direct evidence of discrimination or by following the burden-shifting framework of <u>McDonnell</u>

<u>Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Dr. Adrian does not allege direct evidence of

discrimination, so to state a Title VII discrimination claim she must allege facts which establish a

prima facie case of discrimination, <u>i.e.</u>, "(1) she is a member of a protected class, (2) she suffered

an adverse employment action, (3) she was qualified for the position at issue, and (4) she was

treated less favorably than others not in the protected class."  <u>Khalik v. United Air Lines</u>, 671 F.3d

1188, 1192 (10th Cir. 2012).  Dr. Adrian only needs to allege facts that, if true, plausibly allow a

factfinder to conclude that the Board violated Title VII.  <u>Id.</u> at 1193.

The Court first addresses the issue whether Dr. Adrian was an employee under Title VII.[2]

Title VII defines an employee as follows:

> An individual employed by an employer, except that the term "employee" shall not
> include any person elected to public office . . . or *any person chosen by such officer*
> *to be on such officer's personal staff*, or an appointee on the policy making level or
> an immediate adviser with respect to the exercise of the constitutional or legal
> powers of the Office. . . .

42 U.S.C. § 2000e(f) (emphasis added).

The personal staff exemption is an affirmative defense that defendants must plead under

Rule 8(c), Fed. R. Civ. P.  <u>Oden v. Oktibbeha Cnty., Miss.</u>, 246 F.3d 458, 467 (5th Cir. 2001)

(citing <u>Nichols v. Hurley</u>, 921 F.2d 1101, 1111 (10th Cir. 1990)).  The exemption allows

defendants to avoid liability even if Dr. Adrian meets her burden of proof under Title VII.  <u>Oden</u>,

---

[2]        The Tenth Circuit has held that Title VII's requirement that plaintiff be an employee
is an element of plaintiff's claim for relief and does not constitute a basis to dismiss for lack of
subject matter jurisdiction.  <u>Xie v. Univ. of Utah</u>, 243 F. App'x 367, 371 (10th Cir. 2007).  The
Court thus analyzes defendants' motion solely under Rule 12(b)(6).

246 F.3d at 467.   Defendants bear the initial burden of demonstrating that the personal staff exemption applies.   Id. (citing Nichols, 921 F.2d at 1111).

The Board, comprised of six individual, publicly elected members, is the governing body of the College, with the power to appoint and fix the compensation of the President.   K.S.A. § 71-201(b)(4).   By statute, the President of a Kansas community college is appointed by the Board, the elected governing body.   K.S.A. § 71-701(b).   Defendants argue that because the Board members are publicly elected, Dr. Adrian qualifies as a "person chosen by a [publicly elected] officer to be on such officer's personal staff," and should therefore not receive Title VII protection.   See 42 U.S.C. § 2000e(f); see also Memorandum In Support Of Defendants' Motion To Dismiss Amended Complaint (Doc. #26) filed February 4, 2022 at 9–10.

Title VII does not define the term "personal staff."   In Nichols, 921 F.2d at 1110[3] (quoting Teneyuca v. Bexar Cnty., 767 F.2d 148, 151 (5th Cir. 1985)), the Tenth Circuit adopted a non-exhaustive list of factors to consider in determining whether an employee is subject to the "personal staff" exemption.   They are as follows:

> (1) whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises considerable amount of control over the position, (5) the level of the position within the organization's command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

---

[3]      Nichols examined the definition of an employee under the Fair Labor Standards Act which is essentially identical to that under Title VII.   The court looked to the legislative history of Title VII and cases interpreting the personal staff exemption under Title VII for guidance. See Kelley v. City of Albuquerque, 542 F.3d 802, 808 n.7 (10th Cir. 2008).

Nichols, 921 F.2d at 1110.

The legislative history of Section 2000e(f) makes it clear that Congress intended the exemption to be narrowly construed.  See Anderson v. City of Albuquerque, 690 F.2d 796, 800 (10th Cir. 1982) (citing Joint Explanatory Statement of Managers at the Conference on H.R. 1746, 92d Cong., 2d Sess., reprinted in 1972 U.S. Code Cong. & Ad. News 2137, 2179, 2180).  The exemption is meant to target "close, personal relationships, and not merely all relationships between elected officials and their employees." Gomez v. City of Eagle Pass, 91 F. Supp. 2d 1000, 1006 (W.D. Tex. 2000); see 118 Cong. Rec. 4492–93 (1972) (purpose to exempt those chosen by a Governor, Mayor or County Supervisor, whatever the *elected official*, is and "who are in *close personal* relationship and in an *immediate relationship* with *him*") (emphasis added).  The Tenth Circuit has interpreted the exemption to apply to those individuals who are in highly intimate and sensitive positions of responsibility on the staff of an *elected official*.  Nichols, 921 F.2d at 1103 (emphasis added); see Anderson, 690 F.2d at 800–01 (staff director who reports to Human Rights Board did not qualify as "personal staff").

The Court places great weight on the plain language of the statute, which grants an exemption to an individual "chosen by such officer," and the Nichols factors, which emphasize the singular nature of the elected official.  Several courts have held that the "personal staff" exemption does not apply to the relationship between a board or the collective members of a council and a manager or director.  See e.g.,  Brown v. City of Hobart, Okla., No. CIV-12-0189-HE, 2013 WL 1349038, at *2 (W.D. Okla. Apr. 2, 2013) (city officer who did not serve on staff of single elected official, but selected by group of five elected officials, not "personal staff"); Gomez, 91 F. Supp. 2d at 1006 (city manager not "personal staff" because she answered not to elected official, but rather to collective decision-making body); Horne v. Russell Cnty. Comm'n,

379 F. Supp. 2d 1305, 1318 (M.D. Ala. 2005), aff'd, 180 F. App'x 903 (11th Cir. 2006) (County Administrator not "personal staff" because she served at direction of body of public officials).   It is improbable that the personal intimacy and immediacy of a relationship between an individual and a group will be "of the same intensity as the intimacy and immediacy between two single persons." Gomez, 91 F. Supp. 2d at 1006.   Limiting the exemption to persons who serve at the direction of a single public official comports with the exemption's plain meaning and is most consistent with the exemption's purpose. Horne, 379 F. Supp. 2d at 1318.

The plain language of the "personal staff" exemption does not apply to Dr. Adrian as College President, and she has plausibly alleged that she was an employee for purposes of Title VII.

Defendants argue that even if Dr. Adrian was an employee, she does not allege facts that support a prima facie case of race discrimination.   Specifically, defendants argue that the "race and skin color of [Dr. Adrian] did not change during the time she served as College [P]resident," and therefore she cannot plausibly plead race discrimination. See Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1183 (10th Cir. 2006) (where employee hired and fired by same person within relatively short time span, strong inference that stated reason for acting against employee not pretextual).   Defendants also argue that the complaint includes facts that defendants "were motivated by factors other than [] race" in terminating Dr. Adrian.

Dr. Adrian alleges that (1) she is an African American black female; (2) the Board decided not to renew her employment contract and terminated her employment, effective immediately; (3) she was qualified for her position as President and "more than satisfactorily" performing her job; and (4) the Board treated past presidents, all Caucasian, better than they treated her. Amended Complaint (Doc. #21), ¶¶ 127–28, 130, 139; see Khalik, 671 F.3d at 1192 (setting forth prima facie

elements of racial discrimination).  Her complaint specifically alleges that the Board criticized her relationship with the Commission, refused to provide her performance feedback and questioned her travel budget and communication style.  She alleges that no previous Caucasian president faced this kind of treatment by the Board.  Accepting these allegations as true, Dr. Adrian has set forth sufficient factual detail to make it plausible that her adverse employment action occurred under circumstances that "give rise to an inference of unlawful discrimination."  Singh v. Cordle, 936 F.3d 1022, 1037 (10th Cir. 2019).

At this stage, Dr. Adrian only needs to plausibly plead a prima facie case of race discrimination; she does not need to provide evidence that the Board's proffered reasons are "pretext" for racial discrimination or show that the corresponding inferences were more probable than not.[4]  Swierkiewicz v. Sorema N.A., 534 U.S. 506, 515 (2002) ("Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.").  Accordingly, the Court overrules defendants' motion to dismiss Count 1.

## III.    Dr. Adrian's Section 1981 And Section 1983 Claims (Count 3)

Dr. Adrian alleges the same facts to support her claim that the Board and Askren engaged in race discrimination in violation of Section 1981 and Section 1983.  For the reasons stated above, defendants argue that Dr. Adrian cannot state a claim on which relief may be granted because she does not allege facts that support a prima facie case of race discrimination.

Section 1981 protects employees from racial discrimination both in entering an

---

[4]      In support of their motion to dismiss, defendants attach numerous non-discrimination policies and other documents.  In general, a motion to dismiss should be converted to a summary judgment motion if a party submits, and the Court considers, materials outside the pleadings.  GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997).  At this stage, the fact that the College prohibits discrimination is not a factor in the analysis, and the Court does not consider the attachments.

employment contract and enjoying the benefits, privileges, terms and conditions of employment. Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1134 (10th Cir. 2004).  Under Section 1981, disparate treatment claims involve "a situation where the employer simply treats some people less favorably than others because of their race, color, religion or national origin." Drake v. City of Fort Collins, 927 F.2d 1156, 1159 (10th Cir. 1991).  The elements of a disparate treatment claim are the same whether brought under Section 1981, Section 1983 or Title VII. Mann v. XPO Logistics Freight, Inc., 819 F. App'x 585, 594 n.15 (10th Cir. 2020); Crowe v. ADT Sec. Servs., Inc., 649 F.3d 1189, 1194 (10th Cir. 2011); Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1225 n.4 (10th Cir. 2000).  The Court then looks at the disparate treatment elements outlined in McDonnell Douglas to assess the claims.  See Khalik, 671 F.3d at 1192.

As discussed above, Dr. Adrian plausibly alleges that defendants terminated her employment under circumstances that "give rise to an inference of unlawful discrimination." See Singh, 936 F.3d at 1037.  Along with the allegations about the Board's behavior as a whole, the complaint includes specific allegations about Askren.  These allegations include him asking IT to search Dr. Adrian's emails, telling Dr. Adrian she was not "subservient enough" to him and the Board and his continuous lack of attendance at various board meetings to discuss Dr. Adrian's performance, all of which he never did to past Caucasian presidents.  See Amended Complaint (Doc. #21), ¶¶ 60, 71, 90, 94.

Accordingly, the Court overrules defendants' motion to dismiss Count 3 of race discrimination based on Dr. Adrian's termination in violation of Section 1981.

## IV.   Dr. Bruce's Title VII Claim (Count 2)

Dr. Bruce alleges that the Board discriminated against him on the basis of race by

terminating his employment with the College in violation of Title VII.[5]  Defendants argue that Dr. Bruce cannot state a claim on which relief may be granted because he does not allege facts that support a prima facie case of race discrimination.  Defendants rely on the same arguments that they used in support of dismissing Dr. Adrian's claims.  Specifically, defendants argue that the "race and skin color of [Dr. Bruce] did not change" during his employment, and therefore he cannot plausibly plead race discrimination.

Title VII prohibits intentional employment discrimination on the basis of race, which is known as disparate treatment.  See Ricci v. DeStefano, 557 U.S. 557, 577 (2009).  The Court applies a disparate treatment analysis to claims alleging that an employer treats some people less favorably than others because of a protected trait such as race.  See Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1224–25 (10th Cir. 2008).  The "precise articulation" of a prima facie case depends on the context of the claim and the nature of the alleged adverse employment action.  Plotke v. White, 405 F.3d 1092, 1099 (10th Cir. 2005).  In general, a plaintiff may make a prima facie case by showing that (1) he belongs to a protected class, (2) he suffered an adverse employment action and (3) the adverse employment action occurred under circumstances which "give rise to an inference of discrimination." Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d 1177, 1181 (10th Cir. 2002).  An "inference of discrimination" may be shown in various ways, including "actions or remarks made by decision makers," "preferential treatment given to [an] employee outside the protected class," or "the timing or sequence of events leading up to plaintiff's termination." Plotke, 405 F.3d at 1101 (internal citations omitted).  The Tenth Circuit has observed that, in the employment discrimination context, a plaintiff should know "certain details" and can properly plead them to satisfy the plausibility requirement. Khalik, 671 F.3d at 1194.  Such details

---

[5]     Dr. Bruce does not bring a Title VII claim against Askren.

include who engaged in the alleged discriminatory conduct, when and in what context the conduct occurred and why plaintiff believes the conduct was "connected with discriminatory animus." Id.

In support of his claims, Dr. Bruce alleges that (1) he is an African American black male; (2) the Board decided not to renew his employment contract and terminated his employment at the board meeting on May 8, immediately after his wife's discriminatory termination; and (3) he was qualified for his position as Coordinator of Student Engagement and "more than satisfactorily" performing his job. When the Board terminated Dr. Bruce's employment on May 8, it did not follow the policy of allowing the vice president who supervised him to handle the termination; Leite was not consulted about this termination decision. Dr. Bruce also alleges that the Board "harbored stereotypical views" on how he should behave in his role and "only terminated his employment when he did not meet those [racial] stereotypes." Memorandum In Opposition To Defendants' Motion To Dismiss (Doc. #29) filed February 14, 2022 at 11. Dr. Bruce describes an instance of a Board member using "racially-charged language" to describe his work to Dr. Adrian. Specifically, Dr. Bruce alleges that while conducting Dr. Adrian's performance review, Tuggle complained that Dr. Bruce was "out in the community begging for money to support various Diversity, Equity, and Inclusion initiatives." Amended Complaint (Doc. #21), ¶ 116.

Accepting these allegations as true, Dr. Bruce has set forth sufficient factual detail to create an "inference of discrimination," based on the timing of events and the content of the remark made by Tuggle. See Plotke, 405 F.3d at 1101. Accordingly, the Court overrules defendants' motion to dismiss Count 2.

## V.    Dr. Bruce's Section 1981 And Section 1983 Claims (Count 4)

Dr. Bruce alleges the same facts to support his argument that the Board and Askren engaged in race discrimination in violation of Sections 1981 and 1983. For the reasons stated above,

defendants argue that Dr. Bruce cannot state a claim on which relief may be granted because he does not allege facts that support a prima facie case of race discrimination.

As explained above, the elements of a disparate treatment claim are the same whether brought under Title VII, Section 1981 or Section 1983, so the Court will look to the elements outlined in <u>McDonnell Douglas</u> to assess the claims.  <u>See</u> <u>Khalik</u>, 671 F.3d at 1192.

As discussed above, Dr. Bruce plausibly alleges that his adverse employment action occurred under circumstances that "give rise to an inference of unlawful discrimination," by the Board.  <u>Singh</u>, 936 F.3d at 1037.  Furthermore, the complaint describes a specific instance involving Askren.  Askren asked Nordell about a vehicle Dr. Bruce used to take members of the Black Student organization to church.  <u>Amended Complaint</u> (Doc. #21), ¶ 83.  Askren called only one day after running a meeting discussing performance issues with Dr. Adrian, Dr. Bruce's wife, claiming she was not "subservient enough to him and the Board."   <u>Amended Complaint</u> (Doc. #21), ¶ 70–71, 83.  The complaint alleges that Askren never made similar phone calls about other Caucasian employees.  <u>Amended Complaint</u> (Doc. #21), ¶ 84.

Accepting these allegations as true, Dr. Bruce has set forth sufficient factual detail to create an "inference of discrimination," based on the timing of the events and Askren's "preferential treatment given to employees outside the protected class."  <u>Plotke</u>, 405 F.3d at 1101; <u>Singh</u>, 936 F.3d at 1037.  Accordingly, the Court overrules defendants' motion to dismiss Count 4.

**IT IS THEREFORE ORDERED** that <u>Defendants' Motion To Dismiss Amended Complaint</u> (Doc. #25) filed February 4, 2022 is **OVERRULED**.

Dated this 16th day of May, 2022 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge
